# Case No. 343.

The AMY WARWICK, (J. L. Phipps & Co., Claimants.)

[2 Spr. 150;¹ 24 Law Rep. 501, 544.]

District Court, D. Massachusetts. April, 1862.²

PRIZE PRACTICE—RIGHTS OF NEUTRAL—DISPOSITION OF CAPTURED PROPERTY.

1. A detailed statement, supported by affidavits, is required of any party who asks leave to offer new and independent proof.

2. This rule does not apply where it is only sought to meet with counter proof, to the same points, evidence introduced by an opponent.

3. In a case of further proof, the testimony was ordered to be taken in the form of depositions on interrogatories and cross-interrogatories, that being the more satisfactory form of proof.

4. Objections to the delivery of the captured property on bonds, to claimants.

5. Where a neutral has a jus in re, where he is in possession with a right of retention until a certain amount is paid to him, the captor takes cum onere and should allow the amount of such right. But where the neutral has merely a jus ad rem, which he cannot enforce without the aid of a court of justice, his claim will not be recognized by a prize court.

6. A neutral merchant purchased a cargo of coffee for enemy correspondents, partly with their funds and partly with his own, and shipped it under a bill of lading by which it was to be delivered to his order, and with a statement thereon that part of the coffee was the property of neutrals. Held, that, having the legal title and possession, he was not to be deemed a lien holder, but rather a trustee with the right of retention until his advance should be paid to him.

7. In such case, a prize court will look beyond the legal title, and deal with the beneficial interest. The neutral will be paid the amount of his advance, and the residue of the property will be condemned as enemy's.

8. A motion for a second order for further proof was refused, because it was made at the final hearing (it being doubtful whether the motion could have been granted even if made at an early day), when it was known that the cause was to be carried up by appeal, because such an order would occasion great delay, while it could be granted in the circuit court without delaying the final decision.

[9. Cited in Miller v. U. S. 11 Wall. (78 U. S.) 322, to the point that confiscation of property not for the use made of it, but for the personal fault of the owner, is punitive, and punishment should be inflicted only upon due conviction of personal guilt.]

[In admiralty. Libel in rem against the brig Amy Warwick and cargo, as prize of war. The vessel sailed from Rio Janeiro May 29, 1861, with a cargo of coffee, destined to Hampton Roads for orders. By her charter party she was to go either to Richmond, New York, Philadelphia, or Baltimore. She was captured August 10, 1861, by the United States ship of war Quaker City; and brought into this district for condemnation. The brig was claimed by David Currie and others; the cargo, by Edmond, Davenport &

¹[Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]
²[Affirmed by circuit court, (decree nowhere reported; opinion not now accessible.)]

Co. and Dunlop, Moncure & Co.,—all of Richmond, Va. J. L. Phipps & Co., an English house at Rio Janeiro, filed a claim for an advance made to supply a deficit of funds to purchase the cargo. The property was condemned, (The Amy Warwick, Case No. 341; Id. 342,) and all the claims dismissed, excepting that of Phipps & Co.]

In the decree lately made in this cause, the brig and a part of the cargo were condemned as enemy's property, being confessedly the property of permanent residents in Richmond, Va. The rest of the cargo, 4700 bags of coffee, was claimed by Messrs. Phipps & Co., an English house at Rio Janeiro, having a branch house in New York. After the hearing on the evidence in preparatory, by which it appeared that this cargo was bought for a Richmond house, the claimants moved for leave to offer further proof, for the purpose of showing that they were neutrals; that they advanced about $15,000 to supply a deficit of funds to purchase this cargo; that they took and held the bills of lading in their own name, to protect their advance, and had not waived or parted with their legal title. This motion was supported by affidavits of the claimants' belief in those facts, and of their grounds for expecting to obtain the proof of them. The motion was allowed. The captors then moved that the order include a right to them to take counter proof to the same points. The claimants objected that the captors must file a motion, with affidavits, as had been required of them.

SPRAGUE, District Judge, was of opinion that a detailed statement, supported by affidavits, was required of any party who asked leave to offer new and independent proof, but that the rule did not apply to a party who only sought to meet with counter proof, to the same points, the evidence introduced by an opponent. A question also arose whether the proofs should be by affidavits or in the form of depositions. The English and some American cases were referred to, as allowing affidavits in cases of what is technically called further proof, as distinguished from plea and proof.

SPRAGUE, District Judge, said that, without deciding that affidavits were inadmissible in cases of further proof, he should order the proofs in this case, as more satisfactory, to be taken by a commissioner, on interrogatories and cross-interrogatories. The order was accordingly made, allowing the claimants to take further proof to the points set forth in their motion, and the captors to take counter proofs to the same points, each to file interrogatories within three days, with three days for cross-interrogatories, the proofs to be returned on or before a day fixed. The claimants then moved to have the cargo appraised and delivered to them on bonds. They claimed that the hearing in preparatory being had, and they being allowed further proof, they were entitled to take the property on bonds, by the practice of prize courts. This was opposed by the captors, who moved for a decree for a sale of the cargo.

SPRAGUE, District Judge. There are very serious objections to delivering captured property on bonds to claimants, which have always weighed with prize courts. Before the hearing in preparatory, it cannot well be judicially known that the claimants are not enemies, or acting for enemies, or that they have such absolute title in the property as to be the persons to whom it should be restored, in case it should be decided to be no prize,—beside the consideration that the captured property may itself be evidence. If, on the hearing, their claim remained in doubt on any of these points, why should they take the property rather than the captors? The court must be careful to deliver the property to none but actual owners, and persons who would not pass it to any enemy for whom they might act. There are other difficulties attending this course. It throws on the captors the risk of the sufficiency of the bondsmen at the time, and their continued solvency until a final decision in the appellate court. It gives the claimants the choice of abiding or not abiding by the appraisement. If it is low, they would adopt it and give bonds, and so make a profit at the expense of the captors. If the appraisement is to the full value, they may decline to give the bonds. And there is always danger of undervaluation, not only by fraud, and by the pressure of interests in the trade, but from erroneous principles of estimation. A public sale is the best and fairest proof of value; and the most satisfactory course is to sell the property, deposit the funds in the registry to be delivered to the parties finally decided to be entitled to them, where there are no special circumstances. But, in this case, there is an especial objection to the delivery to these claimants. As the hearing left the case, and as the claimants propose to place it on further proof, they hold the legal title only to protect their advance, which is only about $10,000 out of a value of over $100,000. The residue they would hold in trust for an enemy. Being neutrals, their duty would be, after deducting their advance, to deliver the residue to the enemy. Now, the prize court of no nation can be expected to deliver captured property over to a neutral who would hold it in trust for an enemy. The most that a neutral claiming an interest can expect, is that his interest shall be protected. This is sufficiently done by allowing him to pay his advance out of the proceeds in the registry. Whether a prize court will respect such an interest, and whether there is such an interest in this case, are points to be argued and determined after the further proofs shall come in. After this opinion of the court, the claimants made no objection to the captors'

motion for a sale. A decree was accordingly made for a sale of all the cargo by the marshal, after notice in the chief commercial papers of New York and Boston.

A hearing was subsequently had on the further proof taken in the case.

R. H. Dana, Jr., for the captors, cited The Ida, Spinks, 331; The Abo, Id. 349; The Aina, Id. 316; The Ariel, 11 Moore, P. C. 119; The Marianna, 6 C. Rob. Adm. 25; and The Frances, 8 Cranch, [12 U. S.] 418,—to the point that the prize court would not protect the interest or lien of the neutral claimants, and contended that their lien had been waived.

S. Bartlett and E. Bangs, for the claimants, relied on The St. Joze Indiano, 1 Wheat. [14 U. S.] 208.

SPRAGUE, District Judge. I come now to the claim of J. L. Phipps & Co. After a hearing upon the preparatory evidence, the court, on motion of the claimants, allowed the introduction of further proof. It now appears that these claimants, five in number, are British subjects, two of them residing in New York, one in Rio de Janeiro, and two in Liverpool, and they constitute the three commercial houses of J. L. Phipps & Co. at New York, Phipps Brothers & Co. at Rio, and Phipps & Co. at Liverpool. In March, 1861, this brig, the Amy Warwick, was owned by David Currie and others of Richmond, Va., who chartered her to Dunlop, Moncure, & Co., of that city, for a voyage to Rio, and back to a port of discharge in the United States. Currie and others appointed and paid the master and crew, and retained the ownership of the vessel, during the voyage. Dunlop, Moncure, & Co. put on board a cargo of merchandise consigned to Phipps Brothers & Co. at Rio. They disposed of the cargo, and with the funds of the Richmond house in their hands, and £2000 of their own money, purchased these 4700 bags of coffee, and put them on board this vessel, then bound to Hampton Roads for orders. They took from the master a bill of lading, which stated that Phipps, Brothers & Co. were the shippers of this coffee, and that it was to be delivered to their order. Indorsed upon the bill of lading was a statement declaring that a portion of the coffee was the property of British subjects. This was signed and sworn to by the managing partner at Rio. Phipps, Brothers & Co. indorsed the bill of lading over to J. L. Phipps & Co., of New York. They also delivered to the master one part of the bill of lading, and an invoice of the coffee, and a letter of advice, to be conveyed to the firm in New York. This letter states that the coffee was shipped for account of Dunlop, Moncure, & Co., and that the bill of lading would have been sent to them, had it not been deemed advisable, by reason of the unsettled state of political affairs, for the better protection of the property, and to prevent privateers from molesting the vessel, to have it certified on the bill of lading that a portion of the coffee was British property, and that this referred to the portion against which they had valued on Liverpool. That portion is stated in the claim to be £2000. After the capture, this letter of advice and the accompanying bill of lading came to the hands of J. L. Phipps & Co. at New York, and they indorsed and delivered the bill of lading to Charles M. Fry & Co., of New York, under an agreement that from the coffee there should first be paid to J. L. Phipps & Co. the £2000 advanced by the firm at Rio in making the purchase, and that the residue of the coffee and its proceeds should be held by Fry & Co. as the agents, and for the benefit, of Dunlop, Moncure, & Co. On the 9th of August last, Charles M. Fry filed a claim in this court as agent and in behalf of Dunlop, Moncure, & Co., alleging that they were the owners of the whole of this coffee, excepting the interest of Phipps Brothers & Co. therein to the amount of £2000 advanced towards the purchase. The claim of J. L. Phipps & Co. was filed on the 4th of September last. It alleges that this coffee was purchased by them partly by funds of Dunlop, Moncure, & Co., and partly by £2000 of their own money, that the legal title has always remained in them, "and that no other person is the legal owner, except the equitable interest of said Dunlop, Moncure, & Co." These facts seem plainly to lead to the conclusion that the claimants ought to be repaid the amount which they expended from their own funds in the purchase of the coffee, and that the residue of the proceeds should be condemned. This result I shall adopt, unless precluded from doing so by authority. The counsel for the captors contend that the claimants had only a lien on this cargo, and that liens will not be protected or regarded in a prize court. This position is sustained by the authorities as to certain kinds of liens. The extent of this doctrine, and the reasons on which it is founded, are stated by the supreme court in The Frances, 8 Cranch, [12 U. S.] 418. It is there said that "cases of liens created by the mere private contract of individuals, depending upon the different laws of different countries, are not allowed, because of the difficulties which would arise in deciding upon them, and the door which would be open to fraud." Similar reasons are given by Lord Stowell in The Marianna, 6 C. Rob. Adm. 25, 26, and in several other cases. These reasons are especially applicable to latent liens created under local laws. They do not reach the case now before the court. This coffee was purchased by the claimants at Rio, and shipped by them on board this brig under a bill of lading, by which the master was bound to deliver it to their order, and they ordered it to be delivered to

J. L. Phipps & Co., that is, to themselves. They then retained the legal title, and the possession of the master was their possession. Being the legal owners of the property, they can hardly be said to have a lien upon it; a lien being in strictness an incumbrance on the property of another. Their real character was that of trustees holding the legal title and possession, with a right of retention until their advances should be paid.

In The Frances, and many other cases, it is held that the lien of a neutral carrier for the freight of enemy's goods is, upon capture, to be allowed. The general doctrine seems to be that where a neutral has a jus in re, where he is in possession with a right of retention until a certain amount is paid to him, the captor takes cum onere, and must allow the amount of such right. But where the neutral has merely a jus ad rem, which he cannot enforce without the aid of a court of justice, his claim will not be recognized by a prize court. The Tobago, 5 C. Rob. Adm. 218. The high court of admiralty in England has in some instances gone further against captors, and allowed to British merchants the amount of their claims upon enemies' ships for repairs and supplies. The Belvidere, 1 Dods. 356; The Vrow Sarah, 1 Dods. 355, note. See, also, The Constantia Harlessen, Edw. Adm. 232. The case of the St. Joze Indiano, 1 Wheat. [14 U. S.] 208, has been cited by the counsel for the claimants; and they contend that it sustains their whole claim, and requires all the coffee to be restored to them. That case is a stringent authority to the extent of the £2000 which the claimants invested or advanced in the purchase; but I do not think that it authorizes me to go further. It is in several respects distinguishable from the present case. There the legal title to the cargo was held by enemies. Here it is held by neutrals. In both, the cargo was purchased partly by funds of the holder of the legal title, and partly by funds of their foreign correspondents. But, in the case now before the court, the amount advanced by these neutral claimants is clearly ascertained, while, in the St. Joze Indiano, the amount advanced by the enemy purchasers of the cargo, who held the legal title, did not appear by the preparatory evidence, and could have been ascertained only by further proof to be derived from the enemy, and to depend upon such accounts as he should make up after knowledge of the capture. Another and more important distinction between the cases is the indorsement on this bill of lading, made and sworn to by one of the claimants at Rio, stating that a portion of the coffee was the property of British subjects, thus distinctly announcing that, although, by virtue of the bill of lading, they had the legal title to the whole, part only really belonged to them, and that they held the residue for the benefit of others who were not British subjects. And accompanying this bill of lading was a

letter of instruction from the claimants' house in Rio to their house in New York, in which it is distinctly said that the portion stated to be the property of British subjects is the amount for which they had drawn on their house in Liverpool toward the purchase of the cargo. That amount was £2000. Nor is this all. After the capture, a letter with instructions and the bill of lading came to the hands of the New York house, the bill of lading being indorsed to their order; and thereupon they indorsed and delivered over the bill of lading to Charles M. Fry & Co., who were the agents of Dunlop, Moncure, & Co.; and at the time of such transfer it was agreed that, from the coffee or its proceeds, the £2000 should be paid to the claimants, and that the residue should be held by Fry & Co. as the agents, and for the benefit, of Dunlop, Moncure, & Co. The claimants thus transferred the legal title to the coffee, so far as was in their power in its then condition, to Fry & Co., who were to hold it merely as trustees, first for the benefit of the claimants to the extent of their advances, and the residue for the benefit of the Richmond merchants. Now suppose that the whole of the proceeds of the coffee should be restored to these claimants, it would clearly be their duty, after deducting the £2000 advanced by them, to pay over the residue to Fry & Co. as agents, and for the benefit of the Richmond merchants. The court would thus in effect order that residue (about nine-tenths of the whole) to be paid to Dunlop, Moncure, & Co. Every reason which has been or can be assigned against restoring this cargo to Dunlop, Moncure, & Co., upon their own claim, made through Fry & Co., exists in full force against restoring the residue upon the claim made by J. L. Phipps & Co. These two separate claims have been interposed to the whole of the 4700 bags of coffee. The claimants hope that one of them may be wholly sustained. It is immaterial to them which, and they are accordingly both represented by the same counsel. If the whole property shall be delivered to Fry & Co., they will pay to Phipps & Co, the £2000, and hold the residue for Dunlop, Moncure, & Co. If the whole be delivered to Phipps & Co., they will pay themselves the £2000, and hold the residue for Dunlop, Moncure, & Co. Prize courts have never thus protected the interest of the enemy. In The Abo, decided in 1854, Spinks, 351, Dr. Lushington says, "This court inquires in whom the property is vested, and not merely at what is called a legal title at common law." In The Maria, decided in 1857, 11 Moore, P. C. 281, 287, it appears that the high court of admiralty condemned a vessel because a neutral claimant held only the legal title, while the beneficial interest belonged to other neutrals. On appeal, this judgment was reversed by the privy council, because the whole property was in neutrals; no doubt

was suggested that, if the beneficial interest had been in enemies, there must have been condemnation. It is contended that the doctrine of these cases is inconsistent with that of the supreme court in The St. Joze Indiano, [supra.] I do not think it necessary to determine whether that case goes the length of deciding that, whenever the mere legal title is in an enemy, condemnation must follow; because, if it be so, it only shows what is apparent from other cases, that belligerents sometimes condemn property upon a doctrine which they do not adopt when it will acquit. If this ought not to be, if in fairness a uniform rule should be established, it certainly ought not to be that which stops at the mere legal title, but that which ascertains and deals with the real beneficial interest. For, if the court were never to look beyond the legal title, the result would be that when such title is held by an enemy in trust for a neutral, the latter loses his whole property; but, when the legal title is in a neutral in trust for an enemy, the property is restored to the neutral, not for his benefit, but merely as a conduit through which it is to be conveyed to the enemy. To refuse to look beyond the legal title is to close our eyes for the benefit of the enemy. It would enable him always to protect his property by simply putting it in the name of a neutral trustee.

This cargo has been sold by an interlocutory order, and the proceeds brought into the registry. If the amount had been less than the original cost, it might have been necessary to look at the order under which the purchase was made, to see whether Phipps & Co. would not be limited to the same proportion of the coffee or its proceeds as the amount of their advance was of the whole purchase money. But that inquiry is unnecessary, because the proceeds exceeds the original cost, interest, and expenses, and Phipps & Co. claim, to their own use only, the amount of their advance and interest. That claim must be allowed. I am saved the necessity of determining the time and rate of interest, the parties having agreed that for this trial the £2000 and interest shall be deemed equal to $10,793.63. This agreement is not to affect either party in any appellate tribunal. The claim of J. L. Phipps & Co., which I have been considering, states the amount of their advances to be £2000. They have now, at this late period, presented a claim for £900 more, and moved for an order for further proof to enable them to obtain evidence to show that their advances toward the purchase amounted to £2900. Considering the statements as to the advance found on the bill of lading in the letter of advice and in the original claim, and that this motion is founded on an account made up in Rio in December last, long after this capture must have been there known, I doubt whether the motion could have been granted, if it had been made at

an earlier day. It is unnecessary, however, to consider that question, because it comes so late that I think I must refuse it by reason of the delay which its allowance at this time would occasion. This cause is to be carried to the circuit court, and thence, it is understood, to the highest tribunal. If further time be allowed in this court, an appeal cannot be taken to the May term of the circuit court. It must go over to October, a loss of five months, and this may occasion the delay of a year in the supreme court; whereas, if a decree be now entered, and the appeal taken, the circuit court can allow further proof, if it see fit to do so, as to the quantum of the advances, without postponing the hearing and determination of the great and vital questions, and without delaying the ultimate decision of the cause.

Decree, that ten thousand seven hundred and ninety-three dollars and sixty-three cents be paid to J. L. Phipps & Co., and that the residue of the proceeds in the registry be condemned.

NOTE, [from original report.] On appeal to the circuit court, £2910. 11s. was allowed instead of £2000. Interest was only allowed to the date of the capture, because the property was so mingled with the belligerents, that it could not be separated until the proof were taken; and for the same reason, the rate of exchange on the day of the capture was taken. No appeal was taken to the supreme court as to so much of the decree as allowed the claim of Phipps & Co. The decree of condemnation of the residue was affirmed. See The Prize Cases, 2 Black, [67 U. S.] 635; [The Amy Warwick, Case No. 341.] A mortgage is treated as a lien, and not as a jus in re. The Hampton, 5 Wall. [72 U. S.] 372.